**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| GALACTIC POWER LLC | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. 4:23-CV-00405-SDJ- |
| v. | § | AGD |
| | § | |
| PICKENS RESOURCE CORP., | § | |
| | § | |
| Defendant. | § | |
| | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Pending before the court are Defendant Pickens Resource Corp.'s Motion for Judgment on the Pleadings (Dkt. #23) and Motion for Summary Judgment (Dkt. #35), and Plaintiff Galactic Power LLC's Motion for Summary Judgment (Dkt. #27). Having reviewed the Motions and all other relevant filings, the court recommends that Defendant Pickens Resource Corp.'s Motion for Summary Judgment (Dkt. #35) be granted. The court further recommends that Plaintiff Galactic Power LLC's Motion for Summary Judgment (Dkt. #27) be denied. The court finally recommends that Defendant Pickens Resource Corp.'s Motion for Judgment on the Pleadings (Dkt. #23) be denied as moot.

**BACKGROUND**

*Factual Background[1]*

On May 27, 2021, Plaintiff Galactic Power LLC ("Galactic") and Defendant Pickens Resource Corporation ("PRC") entered into an Option Agreement ("the Agreement") (Dkt. #27 at

---

[1] The parties do not dispute these facts. *See* Local Rule CV-56(c) ("In resolving the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the responsive brief filed in opposition to the motion[.]").

p. 5). PRC owns a five-acre tract of land in Grayson County ("the Property") (Dkt. #27 at p. 5). The Agreement gave Galactic an option to purchase the Property for $30,000.00 per acre (Dkt. #27 at p. 5). In exchange for the option, Galactic was to pay PRC $2,500.00 "per year for each of years one, two, three and four." (Dkt. #27 at p. 5). Galactic's first payment was due within 30 days of the execution date and all subsequent payments were due on the first day of each annual anniversary of the effective date (Dkt. #27 at p. 5; Dkt. #35 at p. 7 n. 4). However, the Agreement provided that "if [Galactic] does not desire to continue the Option in effect, [Galactic] may elect to not make any such payment, in which case the Option shall terminate immediately." (Dkt. #27 at p. 5) (emphasis omitted). For context, the remainder of the relevant provisions of the Agreement read as follows:

> Option Payment. As consideration for the Option, Purchaser shall pay to Seller the following payments with respect to the corresponding periods of the Option Period that Purchaser desires to keep the Option in effect (collectively the "Option Payment"):
>
> For Option Period commencing upon the Effective Date, Purchaser shall pay Two Thousand Five Hundred and 00/100 Dollars ($2,500.00) per year for each of years one, two, three and four.
>
> The Option Payment for year one shall be due to Seller within thirty (30) days. The Option Payments thereafter are due and payable on the first day of each annual anniversary of the Effective Date, provided that if Purchaser does not desire to continue the Option in effect, Purchaser may elect to not make any such payment, in which case the Option shall terminate immediately.
>
> (iii) All Option Payments made to the Seller shall not be credited to the Purchase Price, and after Payment, are non-refundable.
>
> (b) Exercise of Option. To exercise the Option, Purchaser shall provide Seller with written notice of its election during the Option Period. If the Option is not exercised in accordance with this Agreement prior to the expiration of the Option Period for any reason other than Seller's breach, it shall lapse and be of no further force or effect, in which case Seller shall retain the Option Payment. If the Option is exercised, a purchase and sale contract (the "Contract") shall thereupon exist between Seller and Purchaser pursuant to which Seller shall sell and Purchaser shall buy the Property for the price and upon the terms and

conditions set forth herein. Upon exercise of the Option, Purchaser shall not be obligated  to make any further payment of Option Payment installments which are scheduled to occur thereafter. However, if a Contract fails to close following an exercise of the Option by Purchaser and  there remains additional time within the Option Period, then the continuation of the Option for the remainder of the Option Period shall be subject to Purchaser making payment to Seller of any such intervening installments of Option Payment within thirty (30) days after the failure of such Contract to close within the time period provided in this Agreement  and   thereafter  resuming  payment  of  future  Option  Payment installments as scheduled herein.

(Dkt. #27, Exhibit 1 at p. 3).

Galactic paid PRC for the option period in years one and two (Dkt. #35 at p. 8). Specifically, the initial option fee was due on June 26, 2021, and Galactic paid on July 1, 2021 (Dkt. #35 at p. 8). The second option fee was due on September 1, 2021, and Galactic paid on October 25, 2021 (Dkt. #35 at p. 8). However, Galactic did not make an option fee payment on September 1, 2022 (Dkt. #27 at p. 6). Consequently, on September 1, 2022, Mike Pickens, President of PRC, called Galactic to discuss payment of the option fee (Dkt. #35 at p. 9). On September 14, 2022, Pickens emailed Galactic and stated that PRC had still not received the option payment and noted that it was PRC's understanding that Galactic desired to renew the option period (Dkt. #27 at p. 6). The same day, Galactic spoke with Pickens and assured him that it would pay the option fee (Dkt. #27 at p. 6). In the following weeks, the parties discussed an amendment to the Agreement, and on November 2, 2022, PRC, but not Galactic, signed the proposed amendment to the Agreement (Dkt. #27 at pp. 6–7). On November 30, 2022, PRC sent Galactic a "Notice of Termination of Option Agreement" due to Galactic's nonpayment of the option fee (Dkt. #27 at p. 7). On December 1, 2022, Galactic sent PRC a letter reiterating that it did not intend to terminate the Agreement (Dkt. #27 at p. 7). Along with the letter, Galactic attempted to send the option payment to PRC for the first time, which PRC rejected (Dkt. #27 at p. 7). On January

3

13, 2023, Galactic sent another letter to PRC stating that Galactic still considered the option in full force and effect (Dkt. #27 at p. 7).

***Procedural Background***

On May 5, 2023, Galactic filed a Complaint seeking a declaratory judgment that the Agreement was in full force and effect (Dkt. #1). On May 26, 2023, PRC filed an Answer and a Counterclaim for declaratory judgment that the Agreement terminated when Galactic did not make the option payment on September 1, 2022 (Dkt. #4). On June 16, 2023, Galactic filed a Motion to Dismiss Defendant's Counterclaims and to Strike Defendant's Affirmative Defense of Improper Venue (Dkt. #8). On June 28, 2023, PRC filed an Amended Answer and Counterclaim (Dkt. #9). On July 6, 2023, the District Court denied Galactic's Motion to Dismiss Defendant's Counterclaims and to Strike Defendant's Affirmative Defense of Improper Venue (Dkt. #8) as moot in light of the Amended Answer and Counterclaim (Dkt. #13). On July 7, 2023, the District Court referred the case to the undersigned (Dkt. #14). On July 20, 2023, Galactic filed an Answer to PRC's Amended Counterclaim (Dkt. #17). On October 18, 2023, PRC filed a Second Amended Answer and Counterclaim (Dkt. #18), which was rejected as deficient because PRC did not seek leave of court (Dkt. #18). The same day, PRC sought leave of court (Dkt. #19), and on October 20, 2023, the court granted PRC's Motion for Leave (Dkt. #21) to file its Second Amended Answer and Counterclaim (Dkt. #20). On November 1, 2023, Galactic filed an Answer to PRC's Second Amended Counterclaim (Dkt. #22). On November 16, 2023, PRC filed a Motion for Judgment on the Pleadings (Dkt. #23) which remains pending before the court. On December 4, 2023, Galactic filed a Response to PRC's Motion for Judgment on the Pleadings and a Motion for Summary Judgment (Dkt. #27) which also remains pending before the court. On December 11, 2023, PRC filed a Reply (Dkt. #29). On December 18, 2023, Galactic filed a Sur-Reply to PRC's Motion for

Judgment on the Pleadings (Dkt. #32). On January 8, 2024, PRC filed a Cross-Motion for Summary Judgment and Response to Galactic's Motion for Summary Judgment (Dkt. #35) which also remains pending before the court. On January 16, 2024, Galactic filed a Reply in Support of its Motion for Summary Judgment (Dkt. #38). On January 22, 2024, PRC filed a Sur-Reply to Galactic's Motion for Summary Judgment (Dkt. #40). The same day, Galactic filed a Response to PRC's Cross-Motion for Summary Judgment (Dkt. #41).[2] On April 11, 2024, the parties unsuccessfully mediated this case (Dkt. #44).

### *Live Pleadings and Motions*

In its Complaint, Galactic seeks declaratory judgment that 1) the Agreement is effective and binding, 2) Galactic retained the option to purchase the Property, and 3) PRC's attempt to terminate the Agreement "was of no legal effect." (Dkt. #1 at p. 1). The gravamen of Galactic's Complaint is that its failure to pay the option fee on September 1, 2022, constituted default such that the Agreement required PRC to give notice of the default and allow Galactic sixty days to cure (Dkt. #1 at p. 5). PRC, in its counterclaim, alleges that the option automatically terminated when Galactic did not pay the option fee on September 1, 2022 (Dkt. #20 at p. 6).

In its Motion for Judgment on the Pleadings, PRC argues that "under both Texas law and the terms of the Option Agreement, there are no set of facts that Galactic could plead that would render the Option Agreement to be 'in full force and effect.'" (Dkt. #23 at p. 2). In response, Galactic agrees that the contract is unambiguous, but argues that under its terms, "the Option terminates immediately only if Galactic 'does not desire to continue the Option in effect,' and Galactic 'elect[s] not to make' an option payment." (Dkt. #27 at p. 10). Galactic also asserts that PRC's argument "is inappropriate in a motion for judgment on the pleadings because it necessarily

---

[2] Galactic's analysis in its Response to PRC's Cross-Motion for Summary Judgment (Dkt. #41) is identical to its analysis in its Reply in Support of its Motion for Summary Judgment (Dkt. #38).

requires a determination of facts, e.g., what, if any, terms of the Agreement require strict compliance, did Galactic strictly comply, and was any failure of strict compliance excused." (Dkt. #27 at p. 10). In reply, PRC argues that "regardless of Galactic's desires, Galactic's actions did not comply with the plain language of the Option Agreement." (Dkt. #29 at p. 1) (emphasis omitted).

In its Motion for Summary Judgment, Galactic argues that there is no genuine dispute of material fact that the Agreement contained an intent requirement, and as such, Galactic complied with the terms of the Agreement (Dkt. #27 at pp. 11–14). Galactic further argues that summary judgment is appropriate on PRC's counterclaim because it is a mirror image of Galactic's claim (Dkt. #27 at pp. 14–15).

PRC filed a Cross Motion for Summary Judgment in the alternative to its Motion for Judgment on the Pleadings (Dkt. #35 at p. 1, n. 2). PRC argues that Galactic's position is inconsistent with the nature of option contracts (Dkt. #35 at pp. 11–14). PRC also analyzes the grammatical structure of the Agreement, arguing that Galactic's nonpayment resulted in automatic termination of the option (Dkt. #35 at pp. 15–19). PRC goes on to argue that Galactic's interpretation would render the Agreement an unenforceable illusory contract (Dkt. #35 at pp. 19–20). Finally, PRC asserts that the negotiations regarding an amendment to the Agreement did not waive or extend the September 1, 2022, deadline (Dkt. #35 at p. 24). In response, Galactic offers its own grammatical analysis, concluding that its desire to terminate the option was a condition precedent to termination, and thus, the Agreement remains in full force and effect (Dkt. #38 at pp. 3–5). Galactic also argues that the parties' course of dealing is evidence of Galactic's lack of intent to terminate the Agreement and constitutes waiver of the September 1, 2022, deadline by PRC

(Dkt. #38 at pp. 5–9). Galactic finally argues that PRC waived the "time is of the essence" clause in the Agreement (Dkt. #38 at p. 9).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses to help "secure the just, speedy and inexpensive determination of every action." *Nat'l Cas. Co. v. Kiva Const. & Eng'g, Inc.*, 496 Fed. App'x 446, 449 (5th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). "A claim for declaratory judgment is appropriate for summary judgment when it presents questions of law for the court." *AEP Texas N. Co. v. Hudson*, 389 F. Supp. 2d 759, 763 (W.D. Tex. 2005), aff'd sub nom. *AEP Texas N. Co. v. Texas Indus. Energy Consumers*, 473 F.3d 581 (5th Cir. 2006). "Contract interpretation, including the question of whether a contract is ambiguous, is a question of law." *Associated Indus. Ins. Co. v. Hingel Petroleum, L.L.C.*, No. CV 22-1622, 2024 WL 147844, at *2 (E.D. La. Jan. 12, 2024) (citing *Millennium Petrochemicals, Inc. v. Brown & Root Holdings, Inc.*, 390 F.3d 336, 339 (5th Cir. 2004)).

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Certain Underwriters at Lloyd's, London v. Axon Pressure Prod. Inc.*, 951 F.3d 248, 255 (5th Cir. 2020) (citation omitted). All inferences must be construed in the light most favorable to the nonmoving party. *See id.*; *Osprey Ship Mgmt. Inc. v. Foster*, 387 Fed. App'x 425, 429 (5th Cir. 2010). "[T]he substantive law will identify which facts are material. This means [o]nly disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." *Gibson v. Collier*, 920 F.3d 212, 219 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 653 (2019) (citing *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019)) (internal quotations omitted). "When there are cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Texas v. United States*, 50 F.4th 498, 522 (5th Cir. 2022) (citation and internal quotation marks omitted). However, "[f]actual controversies are resolved in favor of the nonmoving party only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Hart v. State Farm Lloyds*, No. 3:22-CV-01367-N, 2024 WL 310539, at *2 (N.D. Tex. Jan. 25, 2024) (citing *Olabisiomotosho v. Houston*, 185 F.3d 521, 525 (5th Cir. 1999) (internal quotation marks omitted)).

The party moving for summary judgment has the burden of showing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 191 (5th Cir. 2011). "[W]here the movant bears the burden of proof at trial, the movant 'must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor.'" *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020) (citation omitted). However, if the movant does not bear the burden of proof at trial, the movant is entitled to summary judgment if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Gonzales v. ConocoPhillips Co.*, 806 Fed. App'x 289, 291 (5th Cir. 2020) (citation omitted). Once the movant has carried its burden, the nonmovant "must go beyond the pleadings and identify specific evidence in the record showing that there is a genuine issue for trial." *Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 307 (5th Cir. 2020).

"If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Malbrough v. Stelly*, 814 Fed. App'x 798, 802 (5th Cir. 2020) (citation omitted).

**SUMMARY JUDGMENT EVIDENCE**

Galactic submits the following evidence in support of its Motion for Summary Judgment:

| | |
|---|---|
| Unmarked (Dkt. #27) | Declaration of Michael Hoadley |
| Exhibit 1 (Dkt. #27, Exhibit 1): | Option Agreement |
| Exhibit 2 (Dkt. #27, Exhibit 2): | September 14, 2022, email between Hoadley and Pickens |
| Exhibit 3 (Dkt. #27, Exhibit 3): | November 2, 2022, emails between Hoadley and Pickens with attached Second Option Agreement Amendment |
| Exhibit 4 (Dkt. #27, Exhibit 4): | November 30, 2022, Notice of Termination of Option Agreement |
| Exhibit 5 (Dkt. #27, Exhibit 5): | December 1, 2022, letter from Galactic re Notice of Termination of Option Agreement |
| Exhibit 6 (Dkt. #27, Exhibit 6): | January 13, 2022, letter from Galactic re Notice of Termination of Option Agreement. |

PRC submits the following evidence in response and support of its Motion for Summary Judgment:

| | |
|---|---|
| Exhibit A (Dkt. #35, Exhibit A): | Declaration of Mike Pickens |
| Exhibit A-1 (Dkt. #35, Exhibit A-1): | Option Agreement |
| Exhibit A-2 (Dkt. #35, Exhibit A-2): | September 9, 2022, email from Pickens to Hoadley |
| Exhibit A-3 (Dkt. #35, Exhibit A-3): | November 30, 2022, Notice of Termination of Option Agreement |
| Exhibit B (Dkt. #35, Exhibit B): | Galactic's response to PRC's First Request for Admissions. |

PRC objects to Galactic's use of Galactic's Exhibits 2 and 3 "to determine the proper interpretation or construction of the Option Agreement" because they are an improper attempt to use parol evidence to "change or contradict the Option Agreement's express terms." (Dkt. #35 at p. 25). In response, Galactic asserts that it "is not offering Exhibit 2 and Exhibit 3 as evidence of the parties' intent to interpret the terms of the Option Agreement." (Dkt. #38 at pp. 9–10).

PRC's objection is overruled. First, it does not appear that Galactic relies on Exhibits 2 and 3 to alter the terms of the Agreement. A review of Galactic's filings reveals that Galactic mainly relies on Exhibit 2 to show that PRC was aware of Galactic's alleged intent to keep the option open. *See, e.g.,* (Dkt. #38 at p. 4) ("Galactic has submitted uncontroverted evidence that the condition precedent never occurred, as the evidence shows Galactic did not intend to terminate the Option and Defendant knew this. *See* Hoadley Dec., ¶¶ 3–6; *see also* Exhibit 2."). Likewise, Galactic appears to rely on Exhibit 3 to argue that PRC's conduct was inconsistent with its position that the option had terminated. *See, e.g.,* (Dkt. #38 at p. 8) ("Here, the parties continued negotiating the second amendment while the Option Payment remained outstanding. *See* Exhibit 3."). Second, even if Galactic offered Exhibits 2 and 3 to alter the terms of the Agreement, the court, having determined that the Agreement is unambiguous, *infra*, Section I.a–b, does not consider evidence outside the four corners of the Agreement. *See Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) ("Only after a contract is found to be ambiguous may parol evidence be admitted for the purpose of ascertaining the true intentions of the parties expressed in the contract.") (citation omitted). Accordingly, PRC's objection is overruled.

## ANALYSIS

The court recommends that Galactic's Motion for Summary Judgment (Dkt. #27) be denied and that PRC's Motion for Summary Judgment (Dkt. #35) be granted. Because the parties do not dispute the material facts, and in considering each Motion separately, PRC is entitled to judgment as a matter of law for the following reasons.

First, the Agreement is unambiguous. While the parties advance conflicting interpretations of the Agreement, only PRC's interpretation is reasonable because 1) nonpayment of an option fee does not constitute default under the Agreement, and 2) the plain language of the Agreement anticipated that Galactic would communicate its intent to keep the option open by timely payment of the option fee. Second, Galactic did not comply with the terms of the Agreement because it failed to make the option payment on September 1, 2022. Additionally, PRC did not waive strict compliance with the Agreement via its conduct or its communications with Galactic. Accordingly, the court recommends granting PRC's Motion for Summary Judgment.

### I.   The Agreement is unambiguous.

"Whether a provision in a contract is ambiguous is answered by looking at the entire contract and giving effect to each provision." *Besteman v. Pitcock*, 272 S.W.3d 777, 784 (Tex. App.—Texarkana 2008). Once the court determines that the contract is unambiguous, "the writing alone will be deemed to express the intention of the parties, and objective intent rather than subjective intent controls." *Via v. Blanchard*, No. 5:20-CV-170-BQ, 2021 WL 4902391, at *7 (N.D. Tex. July 30, 2021) (internal quotation marks omitted). In this case, both parties assert that the Agreement is unambiguous (Dkt. #27 at p. 10; Dkt. #35 at p. 11). However, each party's interpretation of the Agreement is diametrically opposed to the other, with Galactic asserting that it retains the option and PRC asserting that the option terminated. Even so, "[a]n ambiguity does

not arise simply because the parties advance conflicting interpretations of the contract." *Columbia Gas Transmission Corp. v. New Ulm Gas*, *Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996) (citations omitted). "For an ambiguity to exist, both interpretations must be reasonable." *Id.* Here, the Agreement is unambiguous because, after giving effect to each provision, only PRC's interpretation of the Agreement is reasonable.[3]

### a. Act of Default

First, Galactic's interpretation is unreasonable because nonpayment of an option fee does not constitute default. This is because "[u]ntil it is accepted, an option is not, in legal effect, a complete contract." *Cent. Park Tower, L.P. v. Cort Bus. Servs. Corp.*, No. 4:20-CV-00074-P, 2021 WL 3716651, at *4 (N.D. Tex. Feb. 9, 2021) (citation omitted). Only if the offeree exercises its right to accept the offer does the option contract convert into a bilaterally binding contract. *Faucette v. Chantos*, 322 S.W.3d 901, 910 (Tex. App.—Houston [14th Dist.] 2010). As such, our sister courts and Texas state courts have distinguished an option contract from an absolute agreement or obligation to sell or purchase. *See SASOF III (B) Aviation Ireland DAC v. Nat'l Aero Stands*, LLC, No. 1:19-CV-1112-DAE, 2021 WL 5194723, at *6 (W.D. Tex. June 9, 2021) (holding that the plaintiff's nonpayment constituted a breach because the agreement was not an option contract when an executive "understood that an option to purchase and a requirement to purchase were 'two different things'"); *Manley v. Hanford Dev., Inc.*, No. SA-06-CA-1082-RF, 2008 WL 3978064, at *2 (W.D. Tex. July 16, 2008), aff'd, 324 F. App'x 388 (5th Cir. 2009) ("Texas courts have found that a contract with a liquidated damages clause limiting the seller's

---

[3] Pursuant to the Agreement, the court must look to Texas law in resolving this matter. *See* (Dkt. #27, Exhibit 1 at p. 14) ("This Agreement and all questions of interpretation, construction and enforcement hereof, and all controversies hereunder, shall be governed by the applicable statutory and common law of the State of Texas."); *see also Oceans Healthcare, L.L.C. v. Illinois Union Ins. Co.*, 379 F. Supp. 3d 554, 559 (E.D. Tex. 2019) ("A federal court is required to follow the choice of law rules of the state in which it sits.") (citation omitted).

"sole and exclusive" remedy to liquidated damages is an option contract."); *Smith v. Hues*, 540 S.W.2d 485, 488 (Tex. Civ. App.—Houston [14th Dist.] 1976) ("[S]ince he, as seller, had a mandatory obligation to accept the sum stipulated to be liquidated damages in lieu of appellees' further liability, thereby relieving appellees of the obligation to pay the purchase price, this contract was an option contract and not an absolute agreement of sale and purchase."). In *Walji*, the court explained that

> [i]n a bilateral contract both parties are promisors and both parties are promisees. The legal effect of such a contract is that there are mutual rights and mutual duties. A promise or obligation that is left within the promisor's discretion to perform, not perform, or terminate at will is considered illusory and will not support a bilateral contract. An option contract, on the other hand, is designed to allow the optionee to purchase, with earnest money, the discretion that a bilateral contract lacks. . .An option contract gives the optionee the right to elect to purchase the property at stated terms within a specified period of time, but with no obligation to do so. In other words, a holder of an option who decides not to consummate a transaction may walk away from the contract, and the seller has no recourse except to retain the money for the option.

*Walji v. Met Ctr. NYCTEX, Ltd.*, No. 03-01-00399-CV, 2002 WL 1727624, at *2 (Tex. App.—Austin July 26, 2002) (citations and internal quotation marks omitted).

Here, the parties do not dispute that the Agreement is an option contract (Dkt. #1 at p. 2; Dkt. #20 at p. 5). As such, Galactic's nonpayment of the option fee did not constitute default because payment of the option fee was not an obligation the Agreement imposed on Galactic. Instead, the option fee constituted consideration for "the discretion that a bilateral contract lacks." *Walji*, 2002 WL 1727624, at *2. The permissive language of the Agreement bolsters this conclusion, which states in part that Galactic "may elect not to make any such payment." *See May*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("To be permitted to[.]"); *Walji*, 2002 WL 1727624, at *2 ("The word 'may' does not provide Met Center with an alternative remedy[] but allows Met

Center to decline to exercise its right to terminate the Contract.").[4] And, because Galactic's nonpayment of the option fee did not constitute default, PRC was not required to give notice or otherwise comply with the Default or Notice provisions of the Agreement. *See* (Dkt. #27, Exhibit 1 at pp. 12–13). Accordingly, PRC's interpretation of the Agreement, which is in line with the fundamental nature of an option contract and the language of the Agreement, is reasonable.

### b.  Galactic's Intent

Having determined that nonpayment of the option fee did not constitute default under the Agreement, the court next addresses whether an inquiry into Galactic's "desire" regarding the option is necessary to determine if the option remains in effect. The court finds that Galactic's interpretation of the word "desire" in the Agreement is unreasonable for several reasons. First, without consideration, option contracts are revocable. Next, the plain language of the Agreement does not necessitate an inquiry into Galactic's subjective intent regarding renewal of the option. Finally, reading an intent requirement into the Agreement risks rendering it an unenforceable illusory contract. As such, the contract unambiguously required Galactic to demonstrate its desire to renew the option by timely payment of the option fee.

First, Galactic argues that "the unambiguous language of the Agreement requires a determination of Galactic's intent to continue the Option in effect, and without such determination, nonpayment of the Option Payment does not terminate the Option as a matter of law." (Dkt. #27 at p. 11). However, this interpretation also misunderstands the fundamental nature of an option contract; it is well-settled that option contracts require consideration. *Lopez v. Sanchez*, No. 05-

---

[4] Galactic further argues that the word "may" indicates that "nonpayment 'may' occur, meaning it is not required." (Dkt. #38 at p. 3) (citations omitted). While the court agrees that Galactic's payment of the option fee was in fact optional, as just established, it does not follow that Galactic could retain its option while ignoring the consideration requirement in the Agreement. *See* discussion, *infra*, Section I.b.

14-01108-CV, 2015 WL 7717218, at *3 (Tex. App.—Dallas Nov. 30, 2015); *Probus Props. v. Kirby*, 200 S.W.3d 258, 261 (Tex. App.—Dallas 2006); *Via*, 2021 WL 4902391, at *7–8. And "unless consideration is paid by the offeree to keep the offer open. . .[a]n offer is revocable by the offeror even though he or she expressly declares in the offer that it will not be revoked, or even though the offeror has specified a time in which the offeree can accept the offer." *Id.; In re Kelso*, 196 B.R. 363, 370 (Bankr. N.D. Tex. 1996). Galactic did not attempt to submit the option payment until December 1, 2022, three months after the deadline set forth in the Agreement and one day after PRC terminated the Agreement (Dkt. #1 at p. 5). Because options require independent consideration, PRC was entitled to revoke the option upon Galactic's nonpayment, regardless of Galactic's subjective "desire."

Next, the plain language of the Agreement forecloses on Galactic's intent argument. Under paragraph 2, the Agreement states that, "[a]s consideration for the Option, [Galactic] shall pay to [PRC] the following payments with respect to the corresponding periods of the Option Period that [Galactic] desires to keep the Option in effect." (Dkt. #27, Exhibit 1 at p. 3). Thus, the Agreement delineated that Galactic would communicate its desire to keep the option open by timely payment of the option fee. *See 12636 Rsch. Ltd. v. Indian Bros., Inc.*, No. 03-19-00078-CV, 2021 WL 417027, at *7 (Tex. App.—Austin Feb. 5, 2021) ("To determine unambiguous language's meaning, we look not for the parties' actual intent but for their intent as expressed in the written document.") (citation omitted).

Further, with respect to the portion of the Agreement that states "if [Galactic] does not desire to continue the Option in effect, [Galactic] may elect not to make any such payment," the court agrees with PRC in that it "form[s] an if/then conditional statement that if Galactic does not intend to renew the Option, Galactic may demonstrate this intent by not paying the option renewal

fee." (Dkt. #35 at p. 16). Put differently, "[t]he purpose of Clause 1 is to present a condition that may be achieved through the method stated in Clause 2." (Dkt. #35 at p. 18). Galactic also argues that PRC's interpretation would render "the language in the Agreement regarding Galactic's 'desire' and choice to 'elect'. . . 'meaningless or superfluous.'" (Dkt. #27 at p. 16). However, as just established, the Agreement required Galactic to communicate its "desire" or "elect[ion]" by timely payment of the option fee (Dkt. #27, Exhibit 1 at p. 3). Without timely payment, the Agreement states that "the Option shall terminate immediately." (Dkt. #27, Exhibit 1 at p. 3). As such, the reasonable interpretation of the Agreement is that the option terminated because Galactic did not pay consideration for the option period.[5]

Finally, as PRC correctly points out, (Dkt. #35 at p. 19), Galactic's interpretation regarding intent would risk rendering the Agreement unenforceable. "A contract must be sufficiently definite in its terms to be legally binding." *Cytogenix, Inc. v. Waldroff*, 213 S.W.3d 479, 485 (Tex. App.—Houston [1st Dist.] 2006) (citing *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992)). "If the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." RESTATEMENT (SECOND) OF CONTRACTS § 33 (1981); *id.* (citation omitted). As such, "[a] jury may not be called upon to supply an essential term omitted from the contract and upon which the parties did not mutually agree." *Thompson v. CPN Partners, L.P.*, 23 S.W.3d 64, 71 (Tex. App.—Austin 2000) An "essential" term is

> one that the parties reasonably regarded, at the time of contracting, as a vitally
> important ingredient in their bargain. Failure to fulfill such a promise, in other

---

[5] For example, in *Zurita*, the contract stated that Tenant retained an option to extend the lease, but that "[t]enant's rights under this option shall terminate if. . . Tenant assigns its interest in the lease or sublets any portion of the premises." *Zurita v. Lombana*, No. 01-01-01040-CV, 2003 WL 21027140, at *3 (Tex. App.—Houston [1st Dist.] May 8, 2003). The court held that because of the phrase "shall terminate," the option terminated automatically upon Tenant's sublease of the premises. *Id.* at *3; *see also Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 606 (Tex. 2018) (explaining that the phrase "shall automatically terminate. . . is precisely the type of clear and unequivocal language that imposes a special limitation on a lease" such that "the lease will automatically terminate upon the happening of a stipulated event").

words, would seriously frustrate the expectations of one or more of the parties as to what would constitute sufficient performance of the contract as a whole.

*Cytogenix, Inc.*, 213 S.W.3d at 485 (citing *Neeley v. Bankers Trust Co. of Tex.,* 757 F.2d 621, 628 (5th Cir. 1985)).

Here, because the Agreement was an option contract, the method for Galactic to communicate its intent to renew the option period was "a vitally important ingredient in their bargain" and thus an essential term. *Id.* Galactic argues that "[i]f Galactic elected not to make the Option Payment or conveyed a desire not to continue the Option in effect, the Agreement would terminate immediately. Without such an expressed desire, or election to not make a payment, it does not." (Dkt. #38 at p. 5). However, the Agreement does not provide for a method for PRC to determine whether Galactic intentionally refrained from paying the option fee or how, beyond making the option payment on time, Galactic was to communicate its desire to keep the option open. As such, Galactic's position would provide "no basis for deciding whether the [A]greement has been kept or broken" and would thus render the Agreement unenforceable. Moreover, Galactic's argument, taken to its logical ends, would leave the parties in an unworkable situation. If a party's intent was the indicator for whether an option remains open, the consideration requirement would be rendered superfluous. In other words, under Galactic's interpretation, Galactic need not ever pay an option fee as long as it continues to express an intent to keep the option open. This situation would almost guarantee litigation and is patently out of line with the basic nature of option contracts and the plain language of the Agreement. As such, based on the undisputed material facts and the text of the Agreement, the Agreement is unambiguous.

## II.    *Galactic did not strictly comply with the terms of the Agreement.*

Having determined that the Agreement is unambiguous, the court must now consider if there is a genuine dispute of material fact as to whether Galactic complied with the Agreement. Galactic argues that it strictly complied with the terms of the Agreement, again asserting that nonpayment of the option fee did not terminate the Agreement absent Galactic's intent (Dkt. #27 at p. 13). PRC argues that Galactic did not strictly comply with the Agreement, and that Galactic's nonpayment on September 1, 2022, was effectively a rejection of PRC's offer (Dkt. #35 at p. 20). Galactic goes on to argue that PRC's conduct proves that, even though Galactic did not pay the option fee, Galactic nonetheless strictly complied with the terms of the Agreement (Dkt. #27 at p. 13). Taking each parties' Motion separately, the court finds that Galactic did not strictly comply with the Agreement, nor did PRC waive Galactic's strict compliance.

### a.   The September 1, 2022, Payment Deadline

It is well-settled that "[s]trict compliance with the provisions of an option contract is required." *Chambers v. Hunt Petroleum Corp.*, 320 S.W.3d 578, 583 (Tex. App.—Tyler 2010) (citation omitted). "Effectual acceptance of an option must be unqualified, absolute, unconditional, unequivocal, unambiguous, positive, without reservation and according to terms or conditions of the option." *Cent. Park Tower, L.P.*, 2021 WL 3716651, at *3 (citation omitted); *Besteman*, 272 S.W.3d at 784 (citation omitted). For example, "[i]f an option contract requires the option holder to give notice of his intent to exercise the option, he must timely give this notice; the failure to give it on time is fatal." *Amiblu Tech. AS v. U.S. Composite Pipe S.*, No. CV 22-259-SDD-RLB, 2023 WL 2671002, at *5 (M.D. La. Mar. 28, 2023) (citing *Comeaux v. Suderman*, 93 S.W.3d 215, 220 (Tex. App.—Houston [14th Dist.] 2002)). "Accordingly, a failure to exercise an option

according to its terms, including untimely or defective acceptance, is simply ineffectual, and legally amounts to nothing more than a rejection." *Comeaux*, 93 S.W.3d at 220 (citation omitted).

Here, there is no genuine dispute of material fact that Galactic did not strictly comply with the terms of the Agreement. The parties do not dispute that payment was due on September 1, 2022, or that Galactic did not make an option payment on September 1, 2022 (Dkt. #27 at p. 6; Dkt. #35 at p. 8). Because, as established *supra*, Section I.a.i, the Agreement required Galactic to communicate its intent to keep the option period open by timely payment of the option fee, Galactic's nonpayment constituted a failure to strictly comply with the requirements of the Agreement.[6] *See Stanford v. Evans*, No. 14-08-00776-CV, 2010 WL 2517675, at *4 (Tex. App.—Houston [14th Dist.] June 24, 2010) (mem. op.) ("Because of the undisputed evidence that the Stanfords did not provide written notice of their intent to exercise the Purchase Option through certified or registered mail. . . there is no genuine issue of material fact[.]").

### b. Waiver

Galactic advances several evolving theories by which it argues that PRC waived strict compliance with the Agreement. First, Galactic asserts that PRC waived the September 1, 2022, deadline by emailing Galactic regarding payment of the option fee on September 14, 2022. Next, Galactic argues that PRC ratified the Agreement by negotiating an amendment to the Agreement

---

[6] Although not raised by the parties, the court pauses to note that while Galactic alleges that its nonpayment was "inadvertent" and an "accounting error," Galactic's strict compliance is not excused under the narrow equitable exception. The Fifth Circuit follows a three-part test for determining whether to equitably excuse strict compliance with an option agreement: "1) the delay has been slight, 2) the loss to the lessor small, and 3) when not to grant relief would result in such hardship to the tenant as to make it unconscionable to enforce literally the condition precedent of the lease." *Pizza Inn, Inc. v. Clairday*, 979 F.3d 1064, 1067 (5th Cir. 2020) (citation omitted). Here, Galactic stumbles at the first factor. Galactic's payment of the option fee was due on September 1, 2022. PRC contacted Galactic regarding the option payment by phone on September 1, 2022, by email on September 9 and 14, 2022, and finally by transmission of the Notice of Termination of the Option Agreement on November 30, 2022 (Dkt. #35 at p. 9). Galactic did not attempt to make the 2022 option payment for the first time until December 1, 2022, after PRC sent the Notice of Termination of Option Agreement (Dkt. #25 at p. 9). Accordingly, Galactic's delay was not "slight", nor would it be "unconscionable to enforce literally the" terms of the Agreement. Galactic is thus not entitled to an equitable exception to strict compliance with the terms of the Agreement.

after the option deadline had passed. Third, Galactic argues that because PRC accepted tardy option fee payments in the past, PRC waived Galactic's strict compliance with the Agreement. Finally, Galactic argues that PRC waived the "time is of the essence" clause. In response, PRC argues that the plain language of the Agreement and the timing of the purported waiver foreclose on Galactic's waiver arguments (Dkt. #35 at pp. 21–24). Because the parties do not dispute the facts in this case, the court recommends a finding that PRC did not waive strict compliance with the Agreement as a matter of law.[7] *See In re Highland Cap. Mgmt., L.P.*, No. 19-34054-SGJ11, 2022 WL 3959550, at \*24 (Bankr. N.D. Tex. Aug. 30, 2022), aff'd sub nom. *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P.*, No. 3:22-CV-2170-S, 2024 WL 847017 (N.D. Tex. Feb. 28, 2024) ("While waiver is ordinarily a question of fact, when the surrounding facts and circumstances are undisputed, the question becomes one of law.").

### i. The September 14, 2022, Email

The September 14, 2022, email from PRC to Galactic reads in relevant part: "We have not received the 3rd annual payment totaling $2,500 to extend the 'Option Agreement' (aka Substation Agreement) by another 12 months. I believe it is your intent to renew though. Please send these funds to the same account." (Dkt. #35, Exhibit A-2 at p. 3). The email does not waive the September 1, 2022, deadline because 1) the plain language of the Agreement contains a Waiver provision, 2) even assuming *arguendo* the email constituted a signed written waiver under the Agreement, Galactic did not attempt to pay the option fee for more than two months after the purported waiver, 3) any waiver alleged to have happened after September 1, 2022, is ineffective, and 4) the option was revocable because Galactic did not pay consideration.

---

[7] The parties dispute whether Galactic abandoned its waiver argument (Dkt. #35 at p. 22; Dkt. #38 at p. 6). The court declines to find that Galactic waived the affirmative defense of waiver because in "the overall context of the litigation," there is no evidence that allowing the waiver argument would prejudice PRC, and in any event, PRC has had sufficient time to respond to the defense before trial. *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 577 (5th Cir. 2009).

Galactic first argues that "[PRC] waived any strict compliance requirement when it agreed in writing to accept the Option Payment almost two weeks after the expected payment date." (Dkt. #27 at p. 13) (citing *Gulf Prod. Co. v. Cont. Oil Co.*, 139 Tex. 183, 190 (1942)). Tellingly, Galactic does not cite to the Waiver provision in the Agreement, which reads:

> No waiver or any breach of any agreement or provisions herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provisions herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts. A waiver must be in writing and signed by an authorized representative of the party to be bound thereby in order to be effective.

(Dkt. #27, Exhibit 1 at p. 15). Instead, Galactic argues that under *Gulf Production Company*, "'the parties to a contract [] or option may. . . waive strict performance of the method of payment' and 'the strict performance of a contract which is required to be in writing may be waived, or its terms extended, by oral agreement.'" (Dkt. #27 at p. 13). Here, the plain language of the Agreement, which states that "[a] waiver must be in writing and signed by an authorized representative of the party to be bound thereby in order to be effective" clearly prohibits any waiver by conduct, oral agreement, or unsigned writing (Dkt. #27, Exhibit 1 at p. 15). It was only after PRC raised the Waiver provision (Dkt. #35 at p. 22) that Galactic argued, again without reference to the Agreement, that PRC's September 14, 2022, email constituted a signed writing (Dkt. #38 at p. 7).

In any event, even if the September 14, 2022, email constituted a signed waiver of the September 1, 2022, deadline under the Agreement, it did not waive payment altogether. The email, in relevant part, reads as follows: "We have not received the 3rd annual payment totaling $2,500 to extend the 'Option Agreement' (aka Substation Agreement) by another 12 months. I believe it is your intent to renew though. Please send these funds to the same account." (Dkt. #35, Exhibit A-2 at p. 3). PRC is plainly requesting that Galactic presently pay the option fee. Even so, Galactic did not attempt to make the option payment until December 1, 2022, three months after the

deadline and one day after PRC sent the formal Notice of Termination of Option Agreement (Dkt. #27 at p. 7). Thus, even assuming *arguendo* that PRC executed a signed waiver of the September 1, 2022, deadline, Galactic did not pay the option fee as requested in the purported signed waiver. Thus, the September 14, 2022, email is insufficient to establish waiver of Galactic's strict compliance with the Agreement.

Additionally, the court questions the efficacy of a waiver after the option fee deadline has passed because "a lapsed option contract cannot be revived by a subsequent purported waiver." *In re EXCO Res., Inc.*, No. 18-30155, 2019 WL 4689257, at *9 (Bankr. S.D. Tex. Sept. 25, 2019) (citation and internal quotation marks omitted); *see Bernal v. DK8, LLC*, 571 B.R. 729, 748 (Bankr. N.D. Tex. 2017) ("[A] lapsed option contract cannot be revived by a subsequent purported waiver."); *Kurio v. United States*, 429 F. Supp. 42, 65 (S.D. Tex. 1970) ("[A]n option holder cannot revive an option he declined."); *Voss Rd. Exxon, LLC v. Vlahakos*, No. 01-10-00164-CV, 2011 WL 2623989, at *7 (Tex. App.—Houston [1st Dist.] Jun. 30, 2011) ("[T]he right of first refusal was not revived by any alleged 'waiver' by Reed of timely notice owed to her by VRE in order to exercise the right of first refusal."). For example, in *EXCO*, the contract required the buyer to exercise his right of first refusal by responding to the offer from the seller by certified mail. *In re EXCO Res., Inc.*, 2019 WL 4689257, at *1. The buyer attempted to exercise his right by responding to the offer by email. *Id.* at *2. Nevertheless, the seller sent the buyer an assignment and a bill of sale and took other steps to consummate the sale. *Id.* The sale eventually fell through, and the seller refused to transfer its interest to the buyer because of the buyer's failure to exercise his right of first refusal via certified mail. *Id.* The court held that the buyer's "defective exercise of his right of first refusal operated as a rejection of EXCO's offer to sell." *Id.* at *4. Because the offer was terminated by the buyer's constructive rejection, it could not "be revived by a subsequent purported

waiver." *Id.* at *9. Thus, the court held, "EXCO's conduct in preparation for the sale after the option period closed did not revive Mr. Leonard's option." *Id.* Here, under the terms of the Agreement, the option terminated immediately upon Galactic's nonpayment on September 1, 2022 (Dkt. #27, Exhibit 1 at p. 3). Thus, the timing of the purported waiver renders it ineffective.

Even assuming *arguendo* that the option endured beyond the deadline, "unless consideration is paid for the option, it is revocable during its term." *Culbertson v. Brodsky*, 788 S.W.2d 156, 157 (Tex. App.—Fort Worth 1990). And, "[i]f an offeror revokes an offer before acceptance, the offeree's power of acceptance terminates." *Angel, Tr. for Gobsmack Gift Tr. v. Tauch*, 642 S.W.3d 481, 488 (Tex. 2022). Here, PRC sent a Notice of Termination of Option Agreement on November 30, 2022 (Dkt. #27 at p. 7). Galactic did not attempt to make the option payment until December 1, 2022 (Dkt. #27 at p. 7). Therefore, regardless of any communication between the parties, PRC revoked the option prior to Galactic's attempted payment, rendering the purported acceptance ineffective.[8] As such, the September 14, 2022, email did not waive Galactic's strict compliance with the Agreement.

### ii. *The Fall 2022 Contract Negotiations*

Galactic next states that Galactic and PRC "continued negotiating a second amendment to the Agreement, and [PRC] signed the Second Option Agreement Amendment." (Dkt. #27 at p. 14). Galactic argues that these negotiations "show that [PRC's] argument is nothing more than an after-the-fact attempt to avoid its obligations." (Dkt. #27 at p. 14). PRC responds that Galactic's

---

[8] Galactic also argues that "the default of nominal consideration under an option contract alone is insufficient to terminate or permit lapse of an option." (Dkt. 38 at p. 8) (citing *1464-Eight, Ltd. v. Joppich*, 154 S.W.3d 101, 110 (Tex. 2004)). In *Joppich*, the court analyzed nominal and usually fictional consideration of $1.00 as it applies to short-term options, and as such, is not applicable here. *Joppich*, 154 S.W. 3d at 105–10. Galactic's remaining caselaw on this point is also inapplicable because it is either nonbinding, *see Granite Equip. Leasing Corp. v. Acme Pump. Co.*, 165 Conn. 364 (1973), or deals with contracts for a security interest as contemplated by the Texas Business and Commerce Code § 1.201(37). *See Tackett v. Mid-Continent Refrigerator Co.*, 579 S.W.2d 545 (Tex. App.—Fort Worth 1979); *Federal Sign & Signal Corp. v. Berry*, 601 S.W.2d 137 (Tex. App.—Austin 1980).

argument is "unsupported by legal authority and, once again, is contradicted by the plain language of the [A]greement." (Dkt. #35 at p. 24).

The court agrees with PRC. Pursuant to the Agreement,

> [n]o modifications or amendments to this Agreement, of any kind whatsoever, shall be made or claimed by Seller or Purchaser, and no notices of any extension, change, modification or amendment made or claimed by Seller or Purchaser shall have any force or effect whatsoever unless the same shall be in writing and signed by authorized representative of Seller and Purchaser.

(Dkt. #27, Exhibit 1 at p. 15). Here, it appears that only PRC's representative signed the Second Option Agreement Amendment (Dkt. 27, Exhibit 3 at p. 7). As such, the Second Option Agreement Amendment does not "have any force or effect whatsoever" with respect to waiver. Moreover, as established *supra*, Section II.b.i, contract negotiations are insufficient to establish waiver absent a signed writing pursuant to the plain language of the Agreement (Dkt. #27, Exhibit 1 at p. 15). Thus, the contract negotiations between the parties are insufficient to establish waiver of Galactic's strict compliance with the Agreement.

### iii.  *PRC's Past Acceptance of Late Payments*

Galactic next argues that because PRC accepted option payments after the deadline for the first two years, PRC "waived any argument that the Option expired on September 1, 2022." (Dkt. #38 at p. 5). However, PRC's past acceptance of tardy payments did not waive Galactic's September 1, 2022, payment deadline because 1) the plain language of the Agreement prohibits any extension of time from being deemed as an extension of time for the performance of other obligations or acts, 2) there is no evidence that PRC, by its conduct, waived the 2022 payment deadline and the Waiver provision in the Agreement, and 3) the Waiver provision is not so general as to render it ineffective.

The parties agree that PRC accepted Galactic's late option payments in the past; the following chart is included in PRC's Cross Motion for Summary Judgment:

| OPTION YEAR | OPTION PERIOD | PAYMENT DUE | PAYMENT RECEIVED |
|---|---|---|---|
| Year One | September 1, 2020-September 1, 2021 | June 26, 2021 | July 1, 2021 |
| Year Two | September 1, 2021-September 1, 2022 | September 1, 2021 | October 25, 2021 |
| Year Three | September 1, 2022-September 1, 2023 | September 1, 2022 | |
| Year Four | September 1, 2023-September 1, 2024 | N/A – Option terminated. | |

(Dkt. #35 at p. 8). However, the Agreement states that "[n]o extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts" (Dkt. #27, Exhibit 1 at p. 15). Thus, the plain language of the Agreement extinguishes any argument that PRC's acceptance of late payments in the past waived the September 1, 2022, payment deadline.[9]

Moreover, even if PRC's acceptance of late payments waived strict compliance with the option fee payment deadlines for 2020 and 2021, there is no evidence that PRC's past conduct waived both the 2022 payment deadline *and* the terms of the Waiver provision.

A contractual waiver provision alters the ordinary rules of waiver. *Indian Bros., Inc.*, 2021 WL 417027, at *9 (citation omitted). Generally, a waiver provision is "facially dispositive" in that

---

[9] Galactic relies on *Horton v. DaimlerChrysler* to argue that "acceptance of late payment can constitute waiver." (Dkt. #38 at p. 6). In *Horton*, the parties formed a contract, but the court held that there was a fact issue with respect to waiver because "Daimler and Commercial accepted tardy payment and failed to take action to enforce any remedies arising from the breach." *Horton v. DaimlerChrysler Fin. Servs. Americas, L.L.C.*, 262 S.W.3d 1, 6–7 (Tex. App.—Texarkana 2008). *Horton* is distinguishable however, because unlike this case, there was no Waiver provision. Here, the Waiver provision expressly prohibits Galactic from relying on previous instances of tardy payment to establish waiver (Dkt. #27, Exhibit 1 at p. 15). Accordingly, the fact that PRC accepted late payments in the past is insufficient to establish waiver of Galactic's strict compliance with the Agreement.

"no waiver may occur on the terms set forth in the []waiver provision." *Id.* Even so, "[a] party may expressly or impliedly waive its rights under a []waiver provision." *Id.* To do so, the party must "manifest clear intent to waive the []waiver provision," not just the disputed right under the contract. *Id.* However, the purported waiving conduct cannot be "anchored in the same conduct the parties specifically agreed would not give rise to a waiver of contract rights." *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 474 (Tex. 2017). As the Texas Supreme Court explained,

> a party to a written contract may waive a provision despite the existence of a[] []waiver or failure to enforce clause, [] based on the view that the []waiver provision itself, like any other term in the contract, is subject to waiver by agreement or conduct during performance. . .however, [i]n order to establish that a[] []waiver clause is not enforceable, the party asserting a waiver must show a clear intent to waive both the clause and the underlying contract provision.

*Id.* at 475 n. 6 (quoting 13 WILLISTON ON CONTRACTS § 39:36 (4th ed. 2013)). Thus, to prevail on its waiver argument, Galactic must establish that PRC's past acceptance of late payments demonstrated 1) an intent to waive the September 1, 2022, payment deadline, and 2) an intent to waive the provision of the Agreement that specifically disallows past extensions from constituting waiver. *See Sedillo as trustee of Filo & Fran Sedillo Revocable Tr. v. Team Techs., Inc.*, No. 3:20-CV-1628-D, 2021 WL 3172209, at *4 (N.D. Tex. July 27, 2021) ("To establish that Sedillo waived this provision, Team must adduce facts showing that he intended to waive not only his rights upon default of the loan, but also to waive *the preservation* of his rights or remedies under the Agreement.") (emphasis in original).

Here, the plain language of the Agreement permits PRC to rely on the Waiver provision and accept late payments without waiving its right to enforce the Agreement as written because acceptance of late payments is the "the very conduct disclaimed as a basis for waiver" in the Agreement. *Shields*, 526 S.W.3d at 474. Thus, the evidence before the court does not demonstrate

that PRC's past conduct waived the 2022 payment deadline or the preservation of its rights under the Agreement.[10]

*Shields* is illustrative of this conclusion. There, the parties' agreement contained the following waiver provision:

> All waivers must be in writing and signed by the waiving party. Landlord's failure to enforce any provisions of this Lease or its acceptance of late installments of Rent shall not be a waiver and shall not estop Landlord from enforcing that provision or any other provision of this Lease in the future.

*Shields*, 526 S.W.3d at 481. Throughout the term of the lease, the tenant often paid rent late, and the landlord regularly accepted the tenant's tardy payments without protest. *Id.* at 473. After the landlord brought a forcible detainer action, the tenant argued that the landlord "waived its enforcement rights, including requiring strict compliance with the terms of the lease-extension option, by accepting his tardy rental payments without specific rebuke." *Id.* at 481. The court held that the landlord's acceptance of late payments was "insufficient as a matter of law" to nullify the waiver provision because the landlord was "engaging in the very conduct disclaimed as a basis for waiver." *Id.* at 484–85. This conclusion was further bolstered by the fact that "the lease provides a specific method for obtaining a waiver." *Id.* at 484.

Galactic argues that *Shields* is distinguishable because "[n]o such explicit provision barring waiver through acceptance of late renewal payments exists in the Option Agreement." (Dkt. #38 at p. 7). The court disagrees; the language in the Agreement is markedly similar to the waiver

---

[10] Galactic relies on *Indian Brothers* to argue that PRC's acceptance of late payments in the past constitutes a manifestation of PRC's "clear intent to waive the nonwaiver provision." (Dkt. #38 at p. 6). The court disagrees. In *Indian Brothers*, the waiver provision prohibited the landlord's "delay in enforcing any obligation" from constituting a waiver. *Indian Bros., Inc.*, 2021 WL 417027, at *9. Because the "[l]andlord's pre-renewal failure to assert rights to remove Indian Brothers' signage. . . is a delay in enforcing obligations under the Lease," the court held that it was "the very conduct disclaimed as a basis for waiver" in the contract. *Id.* at *10. Accordingly, the court held that such conduct was insufficient to establish waiver of the waiver provision. *Id.* Similarly, here, PRC's acceptance of late payments in the past is "the very conduct disclaimed as a basis for waiver" and thus does not constitute a waiver of the Waiver provision.

provision in *Shields*. First, like in *Shields*, the Waiver provision here contains a specific method for obtaining a waiver: it must be "must be in writing and signed by an authorized representative of the party to be bound thereby in order to be effective." (Dkt. #27, Exhibit 1 at p. 15). Moreover, the Agreement states that "[n]o extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts." (Dkt. #27, Exhibit 1 at p. 15). Acceptance of late payments is thus "the very conduct disclaimed as a basis for waiver" in the Waiver provision.

Galactic additionally points out, without further analysis, that "[t]he *Shields* [C]ourt found that a 'nonwaiver provision absolutely barring waiver in the most general of terms,' such as the provision in Paragraph 14(h), 'might be wholly ineffective.'" (Dkt. #38 at p. 7). However, Galactic "stops short of citing the very next sentence," (Dkt. #38 at p. 6), which states: "But we cannot agree that a nonwaiver provision is wholly ineffective in preventing waiver through conduct the parties explicitly agree will never give rise to waiver." *Shields*, 526 S.W.3d at 484. As just established, the Waiver provision in the Agreement specifically anticipates that no extension of time "shall be deemed an extension of the time for performance of any other obligations or acts." (Dkt. #27, Exhibit 1 at p. 15). Furthermore, the cases Galactic cites to this point each involve nonspecific waiver clauses and are thus distinguishable. *See In re Highland Cap. Mgmt., L.P.*, 2022 WL 3959550, at *25 ("Nothing in the general non-waiver provisions in the PRAs provided any specificity as to the above actions or nonactions of the Advisors regarding amendment to the PRAs that would prevent waiver."); *Momentum Project Controls, LLC* v. *Booflies to Beefras LLC*, No. 14-22-00712-CV, 2023 WL 4196584, at *9 (Tex. App.—Houston [14th Dist.] June 27, 2023), review denied (Oct. 27, 2023) ("In this case, the nonwaiver clause is not as specific as the clause the supreme court discussed in *Shields*. The clause in this case is a broad waiver of remedies clause

focused on 'action or failure to act.'").[11] Therefore, PRC's past acceptance of late payments did not waive the 2022 payment deadline or the Waiver provision.

*iv.    The "Time is of the Essence" Clause*

Finally, PRC cites *Probus Properties v. Kirby*, *supra*, to illustrate that time is of the essence when analyzing whether a party strictly complied with an option contract (Dkt. #35 at pp. 20–21). In response, Galactic argues that *Probus* is inapplicable, and in any event, PRC "intentionally waived the time is of the essence clause as evidenced through its conduct and writings." (Dkt. #38 at p. 9).

PRC did not waive the "time is of the essence" clause. Contrary to Galactic's assertion, *Probus* is applicable because it addresses the timeliness of the payment of an option fee. *Probus Props.*, 200 S.W.3d at 261. Moreover, in line with the analysis, *supra*, Section I.a, in *Probus*, the court stated that, because option contracts are "unilateral and for the benefit of the optionee, . . . time is essential to the option and the holder of the option must comply with the terms of the option within the specified time period." *Id.* This is true even if the contract does not include a "time is of the essence clause" because of "the nature of the option and the language requiring timely payment of the option fees makes time essential." *Id.* Here, the Agreement contains a "time is of the essence" clause (Dkt. #27, Exhibit 1 at p. 16). In any event, as established,

---

[11] Galactic's caselaw is further distinguishable because the conduct alleged to have constituted waiver is distinct from this case. In *Highland*, the court found that the defendants waived any right to recover overpayments "by not making such a request or objecting to payments" for almost three years, constituting thirty-five separate transactions of which the defendants were aware. *In re Highland Capital Management*, 2022 WL 3959550, at *24–25. Likewise, in *Momentum Project Controls*, the court found that the plaintiff's "conduct in litigating this case for four years including an adverse interlocutory judgment plus its failure to request arbitration until two weeks before trial constituted acts or failures to act inconsistent with claiming the right to arbitration under its contract[.]" *Momentum Project Controls, LLC*, 2023 WL 4196584, at *9. As such, the court held that "the nonwaiver of remedies clause did not prevent Momentum from waiving its right to arbitration with Young Lee based on Momentum's affirmative actions[.]" *Id.* Conversely, here, PRC contacted Galactic several times within a month of Galactic's nonpayment on September 1, 2022 (Dkt. #27, Exhibit 2; Dkt. #35, Exhibit A-2) and sent the formal Notice of Termination of Option Agreement three months after Galactic's nonpayment (Dkt. #27, Exhibit 4). Therefore, the conduct giving rise to waiver in *Highland* and *Momentum Project Controls* is distinct from the conduct alleged in the case at hand.

*supra*, Section II.b.i–iii, the plain language of the Agreement extinguishes any argument that PRC's emails or past conduct waived the "time is of the essence" clause.

Galactic cites *Manley*, *supra*, to support its argument that PRC waived the "time is of the essence" clause (Dkt. #38 at p. 9). However, *Manley* is distinguishable with respect to waiver. There, a buyer deposited $10,000.00 in an escrow account in order to hold an option to purchase real estate. *Manley*, 2008 WL 3978064, at *1. Pursuant to the parties' contract, the buyer was required to close on the property by November 7, 2005. *Id.* On October 20, 2005, the buyer sent the seller a letter requesting that the closing date be extended to January 6, 2006. *Id.* The seller agreed, and on November 18, 2005, the parties executed an addendum to the contract which extended the closing date in exchange for an additional $100,000.00 in escrow. *Id.* When the buyer did not close by the extended deadline, the seller sent him a letter on April 3, 2006, stating that it had satisfied the conditions precedent in the Agreement and demanded that the buyer close by April 7, 2006. *Id.* The letter further stated that in the alternative, the seller was willing to offer the buyer a 30-day extension for an additional deposit of $50,000.00. *Id.* Almost three months later, the buyer sent the seller an email stating that he wished to have the escrow funds returned to him. *Id.* The seller responded on July 18, 2006, stating that the Agreement was terminated due to the failure to close, and that the seller would therefore retain the deposit as liquidated damages. *Id.* The court held that the contract was an option contract, and that the buyer waived the November deadline, meaning that the seller was entitled to retain the $120,000.00 in escrow as damages. *Id.* at *6 ("If Manley was entitled to a refund of the $100,000.00 if he refused to close, then Hanford received no consideration for the extension.").

The facts at hand are distinguishable from *Manley*. First, Galactic did not pay the option fee until December 1, 2022, three months after the deadline (Dkt. #27 at p. 7). In *Manley*, the buyer

paid the option fee on time, but did not exercise his option by the deadline in the parties' contract. *Manley*, 2008 WL 3978064, at *2. Next, the buyer in *Manley* requested an extension of the closing deadline before its expiration. *Id.* Here, there is no evidence before the court that Galactic requested an extension to pay the option fee, whether before or after the deadline in the Agreement. Third, the contract in *Manley* did not contain a waiver clause, while here, the language of the Agreement forecloses on waiver absent a signed writing (Dkt. #27, Exhibit 1 at p. 15). Further, in *Manley*, the seller provided an email from the original closing date, November 7, 2005, in which the seller expressly agreed to extend the closing deadline. *Manley*, 2008 WL 3978064, at *4. Here, while the September 14, 2022, email is arguably a signed writing, it was not an express waiver, and in any event, occurred after the September 1, 2022, deadline had passed (Dkt. #27 at p. 6). Additionally, the parties in *Manley* executed an addendum reflecting the extension, while here, the parties negotiated an amendment to the Agreement that was never ultimately signed by Galactic (Dkt. #27 at p. 6). Finally, in *Manley*, the buyer paid $100,000.00 as additional consideration for the extended option, while here, Galactic did not pay any consideration for the option or any purported extension. Thus, unlike *Manley*, the parties' conduct here did not waive the "time is of the essence" provision of the Agreement.

### III.    PRC's counterclaim is a mirror image of Galactic's claim.

In PRC's Motion for Judgment on the Pleadings, PRC states that its declaratory judgment counterclaim is "similar to" Galactic's claims (Dkt. #23 at p. 5). PRC goes on to explain that "[b]ecause resolving and dismissing Galactic's declaratory judgment claim will be sufficient to address PRC's counterclaim for declaratory relief, PRC's counterclaim will be voluntarily dismissed upon dismissal of Galactic's claim under Rule 12(c)." (Dkt. #23 at p. 5). In its Motion for Summary Judgment, Galactic argues that PRC's counterclaims should be dismissed "because

it is the mirror image of Galactic's claims and raises issues that turn on disputed facts that will be resolved in this lawsuit." (Dkt. #27 at p. 15). The court agrees because, here, Galactic alleges that it retains the option and PRC asserts that the option terminated. Accordingly, because PRC's claims against Galactic are "mirror images of claims or that raise issues that turn on disputed facts that will be resolved in the underlying lawsuit," the court recommends that PRC's claims against Galactic be dismissed. *United Prop. & Cas. Ins. Co. v. Davis*, No. CV H-18-3227, 2019 WL 4054015, at *8 (S.D. Tex. Aug. 28, 2019).

### IV.    PRC is entitled to attorneys' fees and litigation costs.

Pursuant to the Agreement, the prevailing party in any litigation is entitled to all litigation costs incurred:

> In the event of any litigation between the parties arising out of this Agreement, the prevailing party shall be entitled to recover all litigation costs incurred, including without limitation, reasonable attorneys' and paralegals' fees and costs, whether such fees and costs are incurred at trial, on appeal, or in any bankruptcy proceeding.

(Dkt. #27, Exhibit 1, p. 16). Because the court recommends that PRC's Motion for Summary Judgment should be granted, the court also recommends that PRC is entitled to "all litigation costs incurred" in this matter.

### CONCLUSION AND RECOMMENDATION

The court recommends that Defendant Pickens Resource Corp.'s Motion for Summary Judgment (Dkt. #35) be **GRANTED**. The court further recommends that Plaintiff Galactic Power LLC's Motion for Summary Judgment (Dkt. #27) be **DENIED**. The court further recommends that Defendant Pickens Resource Corp.'s Motion for Judgment on the Pleadings (Dkt. #23) be **DENIED as moot**. The court further recommends that Defendant Pickens Resource Corp.'s counterclaim be **DISMISSED WITHOUT PREJUDICE**. The court finally recommends that

Defendant Pickens Resource Corp. is entitled to attorneys' fees and costs to be determined at a later date.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 2nd day of July, 2024.**


_____
AILEEN GOLDMAN DURRETT
UNITED STATES MAGISTRATE JUDGE